**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Le-Mayne De-Niro Gayle Sawyers,<br><br>     Petitioner,<br><br>v.<br><br>Fitzroy Alexander Wellington and Deneese Wellington,<br><br>     Respondents. | CIVIL ACTION NO.<br>7:22-cv-07153-KMK<br><br>**[PROPOSED] ORDER GRANTING PETITIONER'S HAGUE CONVENTION PETITION AND REQUIRING THE RETURN OF THE CHILD TO JAMAICA** |

In this civil action, Le-Mayne De-Niro Gayle Sawyers ("Mother") petitions for the return of her minor child, J.J.W. (the "Child"), to Jamaica under the Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11. Because Mother has carried her burden of proving a prima facie case under the Hague Convention and ICARA, and because Respondents Fitzroy Alexander Wellington ("Father") and Deneese Wellington ("Step-Mother") have failed to establish an affirmative defense to the return of the Child, the Court **GRANTS** Mother's Hague Convention Petition and **ORDERS** the immediate return of the Child to Mother in Jamaica. To this end, the Court issues these findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. The Court also issues a separate return Order covering the details of return, the issuance of a passport, and the extension of the Court's preliminary injunction.

## I.      INTRODUCTION

Both the United States and Jamaica are parties to the Hague Convention. The Hague Convention is designed "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Mota v. Rivera Castillo*, 692 F.3d 108, 111 (2d Cir. 2012) (quoting

Hague Convention, pmbl.). To further the Hague Convention's goals, courts are asked to preserve

the status quo—the return of children to their country of habitual residence for further proceedings.

*See Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). But the Hague Convention does not permit

courts to consider the merits of any underlying custody dispute; that determination is one for the

courts of the children's habitual residence. *Hollis v. O'Driscoll*, 739 F.3d 108, 112 (2d Cir. 2014)

(stating that "the merits of the underlying custody claim" is "a matter beyond the scope of this

Court's authority in resolving Hague Convention claims"); *see Padilla v. Troxell*, 850 F.3d 168

178 (4th Cir. 2017) ("We recognize the unfortunate nature of this case for all involved, especially

Child. However, the Hague Convention and ICARA do not empower us to address 'the merits of

any underlying child custody claims.'" (quoting 22 U.S.C. § 9001(b)(4)).

## II.   FINDINGS OF FACT

**A.   Pre-Abduction Evidence: The Child's Upbringing in Jamaica Under Mother's Custody and Care Following The Divorce Between Father and Mother**

1.      Father and Mother were married on February 6, 2010, in Mandeville in the Parish

of Manchester, Jamaica. (PX3; ECF24-3; ECF 52-1 at 1 ¶ 3).

2.      Father and Mother are the Child's parents, and the Child was born in October 2013

in the Mandeville Regional Hospital in the District of Mandeville, Parish of Manchester, Jamaica.

(PX2; ECF 24-2; ECF 52-1 at 2 ¶ 4).

3.      The Child lived with Father and Mother in Jamaica until May 7, 2014, when Father

and Mother separated. (ECF 52-1 at 2 ¶ 7). After Father and Mother separated, the Child continued

to live with Mother in Jamaica. The Child had lived with Mother in Jamaica from the time he was

born until he was abducted to the United States on or about June 11, 2021. (ECF 52-1 at 2 ¶ 7).

4.      Following their separation in 2014, Father petitioned for divorce from Mother by

filing a Decree Nisi for Dissolution of Marriage in the Supreme Court of Judicature of Jamaica on

or around December 14, 2016. (PX3; ECF 24-3).

5.      In a correspondence dated July 6, 2017, Father's counsel in the Jamaican divorce proceedings wrote in a letter to the Registrar of the Supreme Court in Kingston, Jamaica asking that the divorce be expedited and be effectuated by August 18, 2017. (PX4; ECF 24-4).

6.      Father submitted an affidavit setting out his proposed details for the Child's care, maintenance, and upbringing. In an amended affidavit filed in the Supreme Court of Judicature of Jamaica and dated August 15, 2017, Father restates these details, including that Mother would have sole custody of the Child in Jamaica:

> **Residence**
> The child [J.W.] resides and will continue to reside with [Mother] at Knockpactrick District, in the parish of Manchester, in a house containing four bedrooms and two bathrooms, and with all the usual amenities. There is no adult other than [Mother] currently residing at the premises.
>
> . . . .
>
> **Financial Provision**
> The said child is maintained by both the [Father and Mother], and this arrangement continues. For each month I pay $22,000 for the maintenance of the child while the [Mother's] contribution comes in the form of her physical security and care.
>
> **Custody Access**
> It is proposed that the [Mother] will have custody and care/control of the child [J.W.] with liberal access to the [Father].

(PX6 ¶ 6; ECF 24-6 at 2).

7.      In a Decree Nisi for Dissolution of Marriage dated July 24, 2017, the Court granted Father's divorce petition and certified that the arrangements set forth in Father's affidavit for the Child's maintenance, care, and upbringing were the best that could be devised under the circumstances. (PX5; ECF 24-5). In doing so, the Court granted Mother sole custody of the Child. (See id.; see also ECF 59 at 3 ¶ 19).

8.      The testimony at trial revealed that after the divorce, in October 2017, Father moved to the United States. (See ECF 59 at 2 ¶ 15). Meanwhile, all witnesses agree that the Child continued to live with Mother in Jamaica up until the child was abducted to the United States on or about June 11, 2021. (See id. at 2 ¶ 16; PX24 at 2 ¶ 6).

9.      Mother exercised her custody rights like any normal parent and raised the Child.

10.     The Child is, and always was, a citizen of Jamaica. (See PX2; ECF 78 at 3 ¶ 10).

11.     In August 2019, Mother and Father agreed that the Child would visit father in the United States. Following the visit, the Child returned home to Jamaica in September 2019 in time for the Child's return to school. (ECF 59 at 3–4 ¶¶ 24, 35). That visit in August and September 2019 was the last time Father had seen the Child until the child was abducted to the United States on or about June 11, 2021. (ECF 59 at 4 ¶ 35).

12.     The Child was enrolled in school at the Church Teachers' College Early Childhood Demonstration School, located at 41 Manchester Road, Mandeville, Manchester, Jamaica, on September 4, 2017. (PX21).

13.     When the Child entered first grade in 2019, he was enrolled in school at Mount Saint Joseph Preparatory School ("Mt. St. Joseph"), a private school located at 82 Manchester Road, Mandeville, Jamaica. (PX15).

14.     During his second-grade year, the 2020 to 2021 school year, the Child's school fee at Mt. St. Joseph was not paid for the Easter Term or the Summer Term. (Id.). A letter from Mt. St. Joseph dated December 3, 2021, stated that this non-payment of fees would bar the Child from entering the third grade in September 2021. (Id.). The testimony at trial, however, indicated that the Child missed the Summer Term in 2021 due to the non-payment of fees, prior to entering the third grade.

15.     Messages exchanged between Mother and Father in May 2021 also show that the Child missed only one term of school. (PX30). In those messages, Mother asks Father to contribute to the Child's school fee, and Father refuses because he believes the Child should be in public school. (Id. (responding to request for the Child's school fees: "I have some thinking to do")).

16.     In the same message exchange, Father states that he is working to ensure that the Child will be enrolled in a public school in Jamaica for the Fall 2021 term. (PX30 (messages on May 27, 2021)).

**B.     Abduction Evidence: Father's Scheme to Abduct and Wrongfully Retain the Child in the United States**

17.     In or around May 2021, Mother and Father began discussing the Child visiting Father for the summer at Respondents' home in Georgia in the United States.

18.     On June 6, 2021, at Father's request, Mother signed a "Permission for Travel" letter prepared by Father giving permission for the Child to travel with Father's friend, Mrs. Angella Samuels, from Kingston, Jamaica to Atlanta, Georgia. (PX7).

19.     The Child's flight from Kingston, Jamaica to Atlanta, Georgia was scheduled for the morning of June 11, 2021. The testimony at trial revealed that the Child's grandmother, Sharon Gayle, drove the Child to the Jamaican airport that morning.

20.     The testimony at trial was undisputed that, when Mother and Father agreed and made plans for the Child to visit Father in the United States on June 11, 2021, Mother and Father both understood that the trip would be only for the summer, and that the Child would be returned home to Jamaica for school by the end of the summer. (PX24 at 4 ¶ 12–13 ("When the Child went to visit his father in the United States in June 2021, my agreement and understanding with [Father], which he acknowledged, was that the Child would only be staying with him for a limited summer visit at his home in the state of Georgia in the United States . . . . Father and Mother verbally agreed

that the Child would be returned to Mother's custody in Jamaica no later than the end of August 2021.")); (ECF59 at 3 ¶ 26 ("The arrangement was for [the Child] to visit for the summer holidays.")).

21.     That Mother and Father both understood the Child would return to Jamaica by the end of the summer is supported not only by the undisputed trial testimony, but also by a May 31, 2021, WhatsApp message from Father to Mother. In that message, Father considered scheduling the Child's trip to the United States earlier than originally planned so that the Child "can get more time with [Father and] get back in time to rest for school." (See PX8).

22.     Father admitted on cross examination that he understood and intended to have the Child visit for a limited-time duration over the summer and then return the Child to Jamaica before the school year began.

23.     Father testified that he did not intend to keep the Child in the United States without Mother's consent until seeing the Child on June 11, 2021 and hearing the Child's concerns about his living conditions in Jamaica. Father's testimony that he decided to abduct and wrongfully retain the Child because the Child expressed concerns about living in Jamaica, however, is belied by evidence showing that Father began concealing information from Mother before he saw the Child on June 11, 2021. The evidence shows that the Child's flight was scheduled to leave Jamaica at 8:05 a.m. and land in Atlanta at 11:15 a.m. (PX9). On June 11, 2021, at 6:10 a.m., Father told Mother that he had been "tracking and communicating with" Sharon Gayle "all morning." Yet he refused to provide Mother with basic status updates and refused to allow Mother to talk to the Child to confirm his status. (See PX9 (Mother asking, "Y is it so hard or what's taking her so long to call so I can talk to my child!")).

24.     Mother became suspicious of Father when he refused to provide Mother with the

contact information for Mrs. Angella Samuels, although she hoped her suspicions were wrong. (PX24 at 5 ¶ 18). In July 2021, Father began intercepting Mother's communications with Child, limiting the time that she could speak to the Child. (Id. at 6 ¶ 22). This led Mother to believe that Father was trying to push the Child out of her life. (Id.)

25.    On June 19, 2021, Mother asked Father the status of getting the Child enrolled in a public school in Jamaica for the Fall 2021 term. Father responded: "I will get it handled. You know I don't play." (PX30).

26.    On July 2, 2021, at 8:19 a.m., Father responded to Mother's request about an update on getting the Child enrolled in a public school in Jamaica for the Fall 2021 term by assuring Mother that the Child "will be going to the top school in the area," and that Father would "get him karki [sic] pants and stuff in the next couple days." (PX30). When Mother asked if the school was McIntosh or Mandeville—two public schools in Jamaica near where Mother and the Child reside—Father changed the subject and refused to confirm which school the Child would attend. (PX30).

27.    On July 24, 2021, Mother told Father that the Child needs "to be back by the end of August so he can get his medical etc. done" before returning to school in Jamaica. (PX30). Father did not respond.

28.    On August 2, 2021, Father revealed for the first time his plan to wrongfully retain the Child in the United States in a WhatsApp message, which stated: "Good morning! I trust all is well. I saw your text re [the Child] getting back in time for school and he mention this morning that you as [sic] about his travel date. Considering he missed out on two terms this school year will be a serious one. We will provide him the support from here on to ensure he achieve his dreams." (PX10).

29.     Upon receiving this message, Mother corrected Father that the Child had missed only one school term and pleaded for Father to send the Child back. (PX11 ("It will not go like this! Plz send my child back to me . . . . That's now [sic] how u deal with business!!!!")). Father refused to return the Child and refused to provide information on where the Child lived or who the Child was with.

30.     On September 30, 2021, Mother filed an application with the Jamaica Central Authority under the Hague Convention for the Child's return home to Jamaica. (PX1). In the application, Mother stated: "I (Mother) authorized for [the Child] to go and spend the summer holiday with his father expecting him to return for school. On the 2nd of August I received text messages and pictures of my child not coming back and enrolled in school. This was never discussed/agreed on." (PX1 at 4).

**C.     Post-Abduction Evidence: The Child's Nomadic Lifestyle in the United States, Father's Pattern of Concealing Information from Mother, and Mother's Hague Petition**

31.     Since June 2021, the evidence shows that the Child has lived in at least three different states and has attended three different schools.

32.     The  Child lived in Georgia with Father and Respondent Deneese Wellington and attended Smoke Rise Elementary School in the DeKalb County, Georgia School District from August 2021 to March 2, 2022. (PX18). Father admitted during his cross examination that the Child had 16 unexcused absences during that period, and that he withdrew the Child from school before the Spring 2022 semester ended.

33.     The Child was out of school from March 2, 2022, until March 15, 2022. He was then enrolled in Teaneck Public Schools in Teaneck, New Jersey. (PX19). The Child was enrolled in this school by Alcia Batchelor. (Id.) According to the trial testimony, the Child and Father (but

not Respondent Deneese Wellington) lived with Ms. Batchelor in New Jersey.

34.     The Child then moved to New York in August 2022, where, according to the trial testimony, he currently resides with Father and Respondent Deneese Wellington. When he moved to New York, the Child was enrolled at Graham Elementary School in the Mount Vernon, New York City School District. (PX20).

35.     Although there is testimony that the Child has made friends in New York and engages in activities in New York such as attending school, attending church, singing in the children's choir, and training in the media department at his church, the evidence shows that he did not move to New York until the summer of 2022, after this action was filed on June 9, 2022. (See ECF 57 at 5 ¶¶ 39–40; ECF 59 at 9 ¶¶ 81–82; PX12). At the time of the January 26, 2023, hearing, the Child had only been in New York for approximately 5 months or less.

36.     Mother testified that Father has never provided her with an address for where the Child was living in the United States. This testimony is supported by the parties' exhibits, which show no record of Father providing Mother with information on the Child's whereabouts. Also, on the Child's school records, Father made no mention of Mother as a non-household relative, an emergency contact, or someone that had permission to receive information regarding the Child's schooling. (PX18, PX19, PX20).

37.     Mother filed her Verified Expedited Petition under the Hague Convention in the United States District Court for the Northern District of Georgia, Atlanta Division, on June 9, 2022. (PX12).

38.     After Mother filed her petition, Father agreed to return the Child to Jamaica and asked stated that he would purchase a ticket for the Child's return flight for June 21, 2022. (PX23, June 19, 2022 9:38 p.m. message). The next day, however, he stated that he did not get a ticket as

promised. Mother said that she would buy the ticket, and Father refused to return the Child until after their Fourth of July plans. (PX23, June 20, 2022 messages).

39.     On June 21, 2022, Father told Mother to book a flight from JFK instead of Atlanta because they would "be travelling hence the morning after we will be close to JFK." (PX23, June 21, 2022 6:14 a.m. message). This was an apparent attempt to mislead Mother into believing that Father and the Child still lived in Atlanta, even though the trial testimony and documentary evidence revealed that Father had already moved from Atlanta to New Jersey at that time. (See PX19 (school records showing New Jersey address)).

40.     Father directed Mother to purchase a ticket for the Child's return on July 5, 2023. Then, on July 2, 2022, at 5:44 a.m., without explanation, he directed Mother to "Cancel [the Child's] ticket until further notice" and again refused to return the Child. (PX23). Rather than explaining why he reneged on his agreement to return the Child, Father stated that the "[t]icket is valid for a year. Delay is not denial." (PX23, July 2, 2022 6:16 a.m. message).

41.     Each time Mother asked Father why he wanted her to cancel the Child's return flight to Jamaica and why he refused to return the Child home, Father responded by asking why Mother had "persons showing up at people place asking for me and my wife with your name om [sic] it?" (PX23, July 2, 2022, 6:15 a.m. message, 6:16 a.m. message, 6:18 a.m. message, 6:19 a.m. message).

42.     Notably, Father never cited concerns about the Child's living conditions, nutrition, safety or well-being, or any lack of supervision or neglect in Jamaica in these WhatsApp messages on July 2, 2022, or any of the numerous other WhatsApp messages exchanged between Father and Mother, as his reason for refusing to return the Child to Jamaica. (See PX8–PX11, PX13, PX23, PX30). The only concern Father raised was that the Child missed a term—which he incorrectly

described as two terms—of school. (PX10; PX30, Aug. 2, 2021, 7:49 a.m. message).

43.     Additionally, Father never suggested (in WhatsApp messages or trial testimony) that Mother ever consented or acquiesced to the Child living in the United States. (See PX8–PX11, PX13, PX23, PX30); (ECF 59 at 10 ¶ 89).

**D.     Child's Return to Jamaica**

44.     There is no evidence that Jamaica is unequipped to protect the Child if he is returned home. In fact, if Father decides to pursue custody proceedings in Jamaica, the evidence shows that he is familiar with Jamaican courts and successfully navigated them in bringing his divorce petition against Mother. (See PX3–PX6).

45.     The Respondents offered evidence of alleged risks that occurred before the Child was removed from Jamaica, but they offered no evidence of risks of harm if the Child is returned to Jamaica.

46.      The Child apparently told Father and Deneese Wellington when he arrived in the United States on June 22, 2021, that he had to run from the police with his Mother late at night because of gambling, and that Mother did not regularly prepare meals for him and he was often hungry.

47.     Sharon Gayle testified that the Mother took the Child to gambling dens, left the child unsupervised or unattended at times, let the Child be hungry, and allowed the child to roam the streets without adult supervision. Ms. Gayle also criticized Mother for being unable to afford the Child's tuition at Mount Saint Joseph. But Ms. Gayle admitted that she had never personally seen Mother gamble, that Mother had never been arrested for gambling, and that she did not know specifically which house or houses gambling occurs in the community.

48.     Mother, Mr. Sawyers, Mr. Williston Gayle, and Ms. Dorrant all denied the

gambling allegations.

49.      Deneese Wellington claimed that the child had to run from police when the police broke up domino gatherings "because this was during covid lockdown," not because of gambling. (ECF 57 at 3 ¶ 27).

50.      The testimony showed that in Jamaica, the Child lives in a small, close-knit, low-traffic neighborhood near many relatives, including cousins and grandparents.

**E.      Procedural History**

51.      After filing her Hague Convention application with Jamaica Central Authority in Jamaica, PX1, Mother retained counsel in a pro bono capacity and filed her Verified Expedited Petition on June 9, 2022, in the Northern District of Georgia, Atlanta Division. (PX12). Mother then moved to transfer the case to this Court and filed an Amended Verified Petition. (ECF 24). In addition to several exhibits attached to the Amended Petition, Mother also filed an ex parte Motion for a Temporary Restraining Order, requesting that the Court issue an order prohibiting Father and Respondent Deneese Wellington from removing the Child from the jurisdiction during the pendency of the litigation. (ECF 25). The Court issued a temporary restraining order and entered a scheduling order that set a hearing for January 26, 2023. (ECF 39).

52.      The Court held a bench trial on January 26, 2023, in White Plains, New York. Marquetta J. Bryan and Steven H. Campbell of Nelson Mullins Riley & Scarborough LLP appeared pro bono on behalf of Mother. Seidia Roach Bernard of Roach Bernard, PLLC appeared on behalf of Father and Respondent Deneese Wellington.

53.      The Court ordered the parties to submit direct examination testimony by affidavit. Mother, Shanett Dorrant, Williston Gayle, and Peter Sawyers offered direct testimony in Petitioner's case-in-chief and were cross examined through live, virtual testimony. Father,

Deneese Wellington, Alcia Batchelor, and Desrene Wellington offered direct testimony in Respondents' defense. Father was cross examined in person at the hearing, and Deneese Wellington and Alcia Batchelor were cross examined through live, virtual testimony. Petitioner had no cross examination of Desrene Wellington. All direct testimony affidavits were entered into evidence, except to the extent that the parties' objections were sustained on the record.

54.     The Court considered Respondents' requests to appoint a guardian ad litem and conduct an in camera interview of the Child. For the reasons stated on the record, the Court denied both requests.

### III.     CONCLUSIONS OF LAW

#### A.     Jurisdiction

This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction). Venue is proper under 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b). Respondents were served with the summons and complaint by a private investigator on November 10, 2022, [ECF 34, 35], and the Court has personal jurisdiction over them.

#### B.     Mother's Prima Facie Case

To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that the child has been "wrongfully removed or retained." 22 U.S.C. § 9003(e)(1)(A). According to the Hague Convention, the removal or retention of a child is wrongful where the removal breaches established custody rights defined by the law of the country in which the child was a habitual resident just before the removal or retention, and when, at the time of removal, these custodial rights were being exercised (either jointly or alone) or would have been so exercised but for the removal. *See* Hague Convention art.

3. Specifically, a petitioner must establish that: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal; (2) the removal of the child was in breach of the petitioner's custody rights under the law of his home state; and (3) that the petitioner had been exercising those rights at the time of removal. *See Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013) (citing Hague Convention art. 3). A petitioner must also show that the children are under age sixteen when returned. *See* Hague Convention art. 4.

If a petitioner establishes his prima facie case, the court must order the child's return unless the respondent can prove that an affirmative defense applies. *See* Hague Convention, art. 12–13(b); 22 U.S.C. § 9003(e)(2). The Court addresses each element in the prima facie case below.

### 1.   Habitual Residence

The Court concludes that the Child's habitual residence just before removal on June 11, 2021, was (and remains) Jamaica.

"The framers of The Hague Convention intentionally left 'habitual residence' undefined, and intended that the term be defined by the unique facts in each case." *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009); *see Ruiz v. Tenorio*, 392 F.3d 1247, 1252 (11th Cir. 2004) (explaining that habitual residence is "a question of fact to be decided by reference to all the circumstances of a particular case"). Habitual residence is determined at the specific point in time "immediately before the removal or retention." Convention, art. 3(a). The Second Circuit has held that a court should apply the following standard in determining a child's habitual residence:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict

with the parents' latest shared intent.

*Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005).

Here, Father removed the Child from the only country he had lived in since birth when he retained him in the United States on June 11, 2021, for what was supposed to be a visit over the summer break. In the time "immediately before the removal," the Court finds that the "shared intent of those entitled to fix the child's residence"—Mother and Father—was that the Child would habitually reside in Jamaica. Father stated under oath in his 2017 divorce petition that the Child would reside in Jamaica with Mother after the divorce, and he moved to the United States the same year. Father acknowledged on cross-examination that Mother had custody, and he testified that when he and Mother were planning the Child's summertime visit in June 2021, it was his intent to return the child home in time for him to return to school in Jamaica in August 2021. Likewise, Mother testified that the Child lived with her his entire life, and that she intended for the Child to continue living with her. The Child was born in Jamaica, regularly attended school in Jamaica, attended church in Jamaica, and lived near many family members in Jamaica. The Child had only visited the United States once before, and that trip was over the summer break in 2019, after which he returned home to Jamaica in time for school. (ECF 59 at 3–4 ¶¶ 24, 35).

Although "the shared intent of the parents" should normally control the habitual residence of the Child, the Second Circuit has stated that courts should also "inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent." *Glitter*, 396 F.3d at 134. Here, there is no "conflict with the parents' latest shared intent," because Mother and Father shared the same intent just before the Child's removal—that the Child was a habitual resident of Jamaica. Thus, the Court believes that it need not address whether the

Child has acclimatized to his new location.

Even so, the Court finds that the evidence does not "unequivocally point[] to the conclusion that the child has acclimatized to the new location." The Child was brought to the United States in June 2021, and in that year-and-a-half span has lived in at least three states and has attended three schools. (PX18, PX19, PX20). The Child did not move to his current residence in New York until August 2022, more than a year after he came to the United States in June 2021 and only 5 or 6 months before the first hearing in this case. Although there was evidence indicating that the Child has made friends in New York and participates in school and church activities, the Court finds that, given that he has spent less than one year in New York, there is insufficient evidence to "unequivocally" show that he has acclimatized to his new location. In addition, Father did not move to New York after Mother filed this action in June 2022. And Father consistently refused to tell Mother where he lived, and he sent at least one misleading message to Mother in an apparent attempt to trick her into believing that he and the Child still lived in Atlanta. (PX23 (June 21, 2022 6:14 a.m. message where Father told Mother to book a flight from JFK instead of Atlanta because he and the Child would "be travelling hence the morning after we will be close to JFK"). The Court is remiss to reward such evasive and deceptive behavior by holding that the Child became "acclimatized" to a new environment while Mother's petition was pending and while Mother was expending time and resources trying to find the Father and Child.

Thus, the Court concludes that the Children's habitual residence immediately before removal was (and remains) Jamaica.

### 2.      Rights of Custody

The Court concludes that Mother had (and continues to have) rights of custody over the Child under Jamaican law just before he was removed and retained. *See* Hague Convention art.

3(a). Under the Hague Convention, "rights of custody" are defined as including "rights relating to the care of the person of the child, and in particular, the right to determine the child's residence." *See* Hague Convention, art. 5. Custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3, § 5(a). As explained by the United States Supreme Court, the Hague Convention's use of "rights of custody" is to be broadly construed. *Abbott v. Abbott*, 560 U.S. 1, 19 (2010) ("[T]he Convention uses the unadorned term 'rights of custody' to recognize 'all the ways in which custody of children can be exercised' through 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.'").

Here, the divorce decree sets the terms of the divorce. (PX3, PX4, and PX5). These documents, along with Father's affidavit in support of his divorce petition [PX6], show that Mother had sole custody following the divorce in 2017, and still has custody today under Jamaican law. Father admitted in his direct testimony affidavit, ECF 59 at 3 ¶ 19, and in his cross-examination testimony that Mother had custody of the Child.

If there were any dispute about whether the Jamaican divorce decree establishes custody, which the Court believes that there is not based on the record evidence, then Jamaican law would remove any doubt. Under Jamaican law, a parent "shall be presumed to have the custody of the child, and as between father and mother, neither shall be deemed to have ceased to have such custody by reason only that the father or mother . . . does not reside with, the other parent and the child . . . ." Jamaican Child Care and Protection Act § 2(4)(a).[1] Here, it is undisputed that Father had not resided with Mother or the Child since October 2017, when he left Jamaica for the United

---

[1]    Mother properly gave notice of her intent to rely on Jamaican law and filed copies of the law on which she relies. ECF No. 67-2 at 8.

States. If he had any custody rights at that time, those rights ceased when he left for the United States. Thus, Mother had "rights of custody" as contemplated under the Hague Convention.

### 3.    Mother's Exercise of her Rights of Custody

The Court also finds that Mother was exercising her custodial rights when Father removed the Child from Jamaica. *See* Hague Convention art. 3(b). Under the parents' custody arrangement, Mother had "custody and care/control of the child" while Father was to $22,000 per month (in Jamaican dollars) for the Child's maintenance. (PX6 ¶ 6; ECF 24-6 at 2). The witnesses at trial with knowledge of this issue unanimously testified that Mother exercised her custody rights like any normal parent and raised the Child.

Because Mother had "rights of custody" and was exercising her custodial rights when Father removed the Child from Jamaica, it follows that Father's removal of the Child breached Mother's custody rights under Jamaican law.

### 4.    The Child's Age

The Child is nine years old, which is young enough for the Hague Convention to apply. Therefore, based on the facts properly before the Court, Mother has proven a prima facie case for the return of the Child under the Hague Convention by a preponderance of the evidence.

### C.    Respondents' Affirmative Defenses

Because Mother established the prima facie case for return of the Child, the Court must order his return unless an affirmative defense applies. For the reasons below, the Court concludes that Respondents have failed to carry their burden of proving that any affirmative defense applies.

The Hague Convention sets forth several affirmative defenses to the return of abducted children. Each defense is narrow. *See* 22 U.S.C. § 9001(a)(4); *see also In re Application of Adan*, 437 F.3d 381, 395 (3d Cir. 2006) (explaining that if a court were to "give an overly broad

construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court."). Importantly, these defenses "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). The report by the Hague Conference reporter cautions against allowing the affirmative defenses to swallow the basic rule of return: "[exceptions] are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter." Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 24 (1982). The Second Circuit has recognized the Pérez-Vera report as the official commentary on the Hague Convention. *Blondin v. Dubois*, 189 F.3d 240, 246 n.5 (2d Cir. 1999). Relying on the Pérez-Vera report, the Second Circuit has cautioned that a "systematic invocation" of these narrow affirmative defenses is "substituting the forum chosen by the abductor for that of the child's residence" and "would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration." *Id.* at 246.

The defenses at issue are the well-settled defense, the consent or acquiescence defense, and the grave risk of harm defense.

### 1.    Well-Settled Defense

The well-settled defense provides that if proceedings are commenced more than one year after wrongful removal, a child should not be returned if he or she has become settled in and is accustomed to his new surroundings. *See* Convention, art. 12. The well-settled defense is inapplicable where proceedings are commenced within one year of the wrongful removal or retention. *Blondin*, 189 F.3d at 247 ("Under Article 12, this exception does not apply unless the

other parent waited more than one year before filing a petition for the child's return.").

Here, the evidence shows that the Child was removed to the United States on June 11, 2021.[2] Respondents wrongfully retained the Child in violation of Mother's custody rights and the Hague Convention in the weeks and months that followed. Mother filed her verified petition on June 9, 2022, within one year of beginning date of the June 11, 2021 trip and subsequent wrongful retention. *Le-Mayne De-Niro Gayle Sawyers v. Fitzroy Alexander Wellington et al.*, No. 1:22-cv-02309-SEG, ECF 1 (N.D. Ga. June 9, 2022).

Because Mother filed her petition within one year of Respondents' wrongful removal or retention, the Court finds that Respondents' well-settled defense fails.

### 2.    The Consent or Acquiescence Defense

Under the Hague Convention, a court "is not bound to order the return of the child," if the petitioning parent either "consented to" or "subsequently acquiesced in the removal or retention" of the child. *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017). Neither the Hague Convention nor ICARA defines consent or acquiescence. *Id.* The consent and acquiescence concepts are distinct from one another, and both are narrow. *Velozny v. Velozny*, 550 F. Supp. 3d 4, 15 (S.D.N.Y. 2021) (citing *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)). The burden of proving this defense rests with the Respondents. *See* 22 U.S.C. § 9003(e)(2)(B).

To establish this defense, Respondents must prove by a preponderance of the evidence that Mother either previously consented or subsequently acquiesced to the removal of the Child. *See* 22 U.S.C. § 9003(e)(2)(B). The consent defense analyzes "the petitioner's conduct prior to the

---

[2]    This date represents the earliest possible date of the wrongful removal or abduction. The parents agreed that the Child would visit the United States for the summer and that he would leave for that limited-duration trip on June 11, 2021. It is unclear exactly when Father began his plan to wrongfully retain the Child, except that he testified that he intended to return the Child to Jamaica while he and Mother were planning his trip. He revealed his abduction scheme to Mother on August 2, 2021, although Mother was suspicious before that date. (PX10).

contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* (citing *Baxter*, 423 F.3d at 371). Although the consent "needn't be formal," it is "important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.* (quoting *Baxter*, 423 F.3d at 371). "The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent." *Id.* (quoting *In re Kim*, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005)). Proving acquiescence "requires a higher degree of formality; either a formal statement by petitioner or a consistent attitude of acquiescence over a significant period of time." *Id.*

Here, as to consent, all witnesses testified that Father and Mother initially planned for the Child to return home to Jamaica after visiting Father in Summer of 2021. Mother and Father began discussing the Child's summer visit in May 2021. To facilitate this limited-duration visit, Mother signed an authorization or letter, prepared by Father, giving permission for the Child to travel with Father's friend, Mrs. Angella Samuels, from Kingston, Jamaica to Atlanta, Georgia. The permission letter did not specify the Child's return date, but Mother and Father agreed that the child would be returned to Jamaica no later than the end of August 2021, to ensure that he was back home before the start of the upcoming school year. (PX24 at 4 ¶ 12–13; ECF59 at 3 ¶ 26). Father testified that he only developed his scheme to wrongfully retain the Child after hearing the Child's concerns about his living conditions in Jamaica. On these facts, the Court finds that the Respondents have not met their burden of proving the consent defense.

As to acquiescence, the record contains pages and pages of WhatsApp messages between Mother and Father showing Mother's repeated efforts to have the Child returned to her in Jamaica. (*See, e.g.*, PX11, PX23, PX30). There has been no testimony or other evidence that Mother ever

agreed to allow the Child to stay permanently in the United States, let alone any formal document reflecting any such agreement. Because acquiescence "requires a higher degree of formality; either a formal statement by petitioner or a consistent attitude of acquiescence over a significant period of time," this lack of evidence is fatal to Respondents' acquiescence defense. *See Velozny*, 550 F. Supp. 3d at 15.

In conclusion, Respondents presented no evidence (in WhatsApp messages, trial testimony, or otherwise) that Mother ever consented or acquiesced to the Child living in the United States. In Father's direct examination, when responding to why he has not returned the Child to Mother, Father makes no mention of Mother having consented or acquiesced to the Child's wrongful retention. (ECF 59 at 10 ¶ 89). The Court therefore finds that Respondents have failed to meet their burden of proving the consent or acquiescence defense.

### 3.    The Grave Risk of Harm Defense

Under Article 13(b), a court may refuse to return a child if it finds that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Like the other affirmative defenses, the grave-risk defense is subject to narrow interpretation. The State Department's interpretation explains the defense's narrow scope:

> In drafting Articles 13 and 20, the representatives of countries participating in negotiations on the Convention were aware that any exceptions had to be drawn very narrowly lest their application undermine the express purposes of the Convention—to effect the prompt return of abducted children. Further, it was generally believed that courts would understand and fulfill the objectives of the Convention by narrowly interpreting the exceptions and allowing their use only in clearly meritorious cases, and only when the person opposing return had met the burden of proof.

Hague Int'l Child Abduction Convention; Text and Legal Analysis (State Legal Analysis), 51 Fed.

Reg. 10494, 10509 (1986) ("Public Notice 957").[3]

The grave-risk defense's language was "chosen carefully and was meant to exclude the type of evidence that is typical to a determination of the merits of a child custody case." *Ross v. Worley*, No. , 2013 WL 12309782, at *12 (N.D. Ga. Feb. 19, 2013) (citing Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 116). Sister circuits have cautioned that "[t]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996); *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) (quoting *Friedrich*). And the U.S. State Department warns that the grave risk defense on which Respondents rely "may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" *Hasan v. Hasan*, No. CIV.A. 03-11960-GAO, 2004 WL 57073, at *4 (D. Mass. Jan. 13, 2004) (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10, 510).

Unlike other affirmative defenses that can be proven only by a preponderance of the evidence, Congress intentionally established a heightened burden for the grave risk of harm defense: clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A) ("In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing . . . by clear and convincing evidence that one of the exceptions set forth in Article 13b or 20 of the Convention applies."). The burden of that proof rests with the party raising the affirmative defense. *Id*. While considering ICARA, the State Department's Assistant Legal Adviser for Private International Law explained that the clear and convincing evidence standard

> is intended to ensure that the exceptions to the Convention's return obligation are sufficiently hard to demonstrate so that their interpretation and application does not become so broad as to provide a precedent in the United States that could undermine the purpose of the Convention and could

---

[3]   As the Eleventh Circuit has recognized, the "State Department's pronouncements, while not binding, are entitled to deference." *Baran v. Beaty*, 526 F.3d 1340, 1348 (11th Cir. 2008).

> have the effect abroad of providing a basis for refusal to return children to
> the United States.

House Subcomm. Admin. Law and Gov't Relations Hr'g. at 38 (Feb. 3, 1988).

Congress did not define clear and convincing evidence in ICARA. This district has explained in a Hague Convention case that clear and convincing evidence requires proof that the "grave risk to the children 'is highly probable or reasonably certain.'" *Poix v. Santana*, 2022 U.S. Dist. LEXIS 189263, at *38 (S.D.N.Y. Oct. 17, 2022) (holding that respondent presented some evidence in support of the grave risk defense, but that the evidence was "insufficient to show it highly probable or reasonably certain that returning the children would expose them to a grave risk of physical or psychological harm"). One sister circuit which also requires proof of "high probability" to meet the clear and convincing evidence standard has described it as "a high burden and an exacting standard." *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 644 (4th Cir. 2000); *see United States v. Perez*, 752 F.3d 398, 407 (4th Cir. 2014) (explaining that clear and convincing evidence "is evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable").

In analyzing the grave risk defense, "only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." Public Notice 957, 51 Fed. Reg. at 10510. "The gravity of the risk must involve 'not only the magnitude of the potential harm but also the probability that the harm will materialize.'" *Poix*, 2022 U.S. Dist. LEXIS 189263, at *38–39 (quoting *Abdollah Naghash Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)). To sustain the defense, the "potential harm to the child must be severe, and the . . . level of risk and danger required to trigger this exception [must] be very high." *Id.* (quoting *Fair*, 720 F.3d at 103).

There are two types of grave risk under Article 13(b): returning the child to a "zone of war, famine, or disease," or in cases of serious abuse or neglect, or extraordinary emotional dependence, "when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id.* (quoting *Fair*, 720 F.3d at 103); *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996); *cf. Baran v. Beaty*, 526 F.3d 1340, 1347 (11th Cir. 2008) (noting that the Sixth Circuit's formulation in *Friedrich* has been "repeated by courts throughout the country, and has been accepted by many lower courts as a governing principle of law"). Here, there is no allegation of any risk of sending the Child to a "zone of war, famine, or disease" by returning him to Jamaica. So the only issue is whether returning the Child to Jamaica presents a grave risk of serious abuse or neglect, or extraordinary emotional dependence "when [Jamaica], for whatever reason, may be incapable or unwilling to give the child adequate protection." *Poix*, 2022 U.S. Dist. LEXIS 189263, at *38–39.

The Court begins its analysis by noting that Respondents have presented no argument or evidence at all that Jamaica "may be uncapable or unwilling to give the child adequate protection." *Id.* Nothing suggests that Jamaica is unequipped to protect the Child if he is returned home. In fact, if Father decides to pursue custody proceedings in Jamaica, the evidence shows that he is familiar with Jamaican courts and successfully navigated them in bringing his divorce petition against Mother. (*See* PX3–PX6). Because this showing is required for grave risk of harm defense based on serious abuse or neglect, or extraordinary emotional dependence, the Court finds that the Respondents' grave risk of harm defense fails. *See Rubio v. Castro*, 813 F. App'x 619, 621 (2d Cir. 2020) (citing *Fair*, 720 F.3d at 103) (holding that although the Respondent met her burden of showing a grave risk of harm, she failed to show that the Ecuadorian courts and the joint agreement between the parties were inadequate to protect the child).

Setting aside that there is no evidence that Jamaica "may be uncapable or unwilling to give the child adequate protection," the Court nevertheless finds that the Respondents failed to meet the high burden for proving the grave risk of harm defense. Respondents presented no cogent evidence of serious abuse or extraordinary emotional dependence. Rather, Respondents rest their grave risk of harm defense on the serious neglect element.

Respondents' neglect theory is based partly on statements that the Child allegedly made to Father and Deneese Wellington when he arrived in the United States on June 22, 2021. Although the Child's statements may be considered hearsay, over Petitioner's objection, the Court liberally allowed evidence of these statements to ensure a full record. The allegations include that the Child had to run from the police with his Mother late at night because of gambling, and that Mother did not regularly prepare meals for him and he was often hungry. Respondents' neglect theory is also based on allegations from Sharon Gayle that the Mother took the Child to gambling dens, left the child unsupervised or unattended at times, let the Child be hungry, and allowed the child to roam the streets without adult supervision. Ms. Gayle also criticized Mother for being unable to afford the Child's tuition at Mount Saint Joseph. Finally, there were allegations that Mother drank alcohol around the Child.

Even if all these allegations are true, the Court finds that they do not rise to the level of constituting a grave risk of harm on the Child's return to Jamaica. At the outset, all the allegations presented by Respondents focus on activities from *before* the removal, which are minimally relevant. The focus on the inquiry is on the Child's return to Jamaica. *See* Hague Convention, art. 13(b). Respondents have presented little evidence of the alleged risks the Child might face if returned to Jamaica.

The Respondents' allegations are similar to those raised in *Hirst v. Tiberghien*, 947 F.

Supp. 2d 578, 595–96 (D.S.C. 2013), which the Court finds instructive. In *Hirst*, there were several arguments and defenses, including the grave risk defense. There were two children in that case, one of which was 10 at the time of the hearing (older than the Child here) and the other was 9 at the time of the hearing (the same age as the Child here). That court district court rejected a grave risk defense and stated:

> Many of the Respondent and the children's claims are, at most, allegations of poor parenting, including Petitioner's alleged drinking and smoking, her alleged use of foul language toward the children, and her alleged tendency to sleep late, which leaves the children to prepare their breakfast and ready themselves for school on their own.

The court continued:

> Respondent's complaints that Petitioner lets the children walk to school on a busy road and lets them go out at night by themselves does not establish that the children were or will be in actual danger in Manchester. Furthermore, it is not this court's prerogative or its mandate in the instant litigation to determine whether one parent would be better than the other, or whether the environment offered by Respondent is superior to the environment offered by Petitioner.

*Id.* Additionally, the Court is not persuaded by Respondents' arguments that Mother's financial status or ability to afford school tuition is grounds for a grave risk of harm defense. The Court notes that the divorce decree (filed by Father) requires Father to pay $22,000 each month for the Child's maintenance. (PX6 ¶ 6; ECF 24-6 at 2). The record evidence reflecting Father's payments for the Child's maintenance amount to a total well short of what he had to pay under the divorce decree, and the Court would be remiss to allow the Father to use Mother's financial status against her while he violates his maintenance obligations. In any event, the Court finds Mother's financial status irrelevant to the grave risk of harm defense. *See Munoz v. Ramirez*, 923 F. Supp. 2d 931, 954 (W.D. Tex. 2013) ("Petitioner's poverty level and extreme economic hardship fall extremely short of reaching the high threshold necessary to establish the grave risk of harm affirmative

defense . . . . Moreover, the Court is secure in finding that poverty and economic hardship are not relevant factors to use when determining whether a court should use its discretionary power in not returning a child to his or her country of habitual residence."); *see also Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) ("[A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do."). And although neither *Hirst*, *Munoz*, nor *Blondin* dealt with gambling allegations or allegations of running from police, the Court finds that the isolated allegations in this case, even accepted as true, do not rise to the level of a grave risk of harm.

The Court also finds that some of many of the allegations lack credibility. As a general matter, the Court finds it curious that there is no evidence that anyone ever confronted Mother about these allegations before Father removed the Child from Jamaica. Nor did anyone try to change custody for the Child through the Jamaican courts. Even after Father removed the Child from Jamaica, he exchanged many correspondences with Mother in WhatsApp, but never once even hinted at any of the concerns raised in support of the Respondents' grave risk of harm defense. The only concern that Father raised to Mother was that the Child missed a school term.

Sharon Gayle claimed that Mother had a gambling problem and that Mother often gambled in the community. But Ms. Gayle admitted that she had never personally seen Mother gamble and that Mother had never been arrested for gambling. And although Ms. Gayle testified on redirect by Respondents' counsel that Mother had hosted gambling parties in Mother's home, the Court assigns that testimony little weight because Ms. Gayle testified before that she did not know

specifically which house or houses gambling occurs in the community. Meanwhile, Mother, Mr. Sawyers, Mr. Williston Gayle, and Ms. Dorrant all denied the gambling allegations. Deneese Wellington claimed that the child had to run from police when the police broke up domino gatherings "because this was during covid lockdown," not because of gambling. (ECF 57 at 3 ¶ 27). With no evidence that Jamaica is still enforcing Covid lockdowns, there is no concern that the Child would be forced run from police upon his return to Jamaica. And as to the allegation that the Child would roam the streets, Petitioner's witnesses all denied those allegations. In any case, the Court finds that the Child lives in a small, close-knit, low-traffic neighborhood near many relatives, including cousins and grandparents. That he walks to homes of different relatives in this neighborhood is not concerning to the Court.

For these reasons, the Court concludes that Respondents' evidence of neglect fails to show clearly or convincingly that the Child will face a grave risk of danger if returned to Jamaica. Respondents have therefore failed to meet their burden of proving this defense.

## ORDER

For these reasons, it is hereby **ORDERED** that Mother's Amended Verified Expedited Petition, [ECF 24], is **GRANTED** as follows:

(1) Father is to immediately return the Child from New York to Mother in Jamaica. The Court will issue a separate, and un-redacted return order along with this Order including more details about the timing and logistics of that return.

(2) Father is ordered to cooperate with consular officials and airline officials from the United States and Jamaica to the extent that his assistance is needed to obtain travel documents for the Child.

(3)     Fitzroy Alexander Wellington, Deneese Wellington, or any others acting on their behalf or at their direction shall not remove the Child from this Court's jurisdiction absent further order of this Court. They shall not relocate the residence of the Child to another location in or out of New York.

(4)     **FAILURE OF RESPONDENTS FITZROY ALEXANDER WELLINGTON AND DENEESE WELLINGTON TO COMPLY WITH THIS ORDER WILL RESULT IN CONTEMPT PROCEEDINGS.** *See* 18 U.S.C. § 401 (providing that a federal court "shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command").

(5)     The Court will take Petitioner's request for the award of attorney's fees under consideration and will entertain further proceedings on that request as necessary.

(6)     The Court shall retain jurisdiction over this action.

**IT IS SO ORDERED.**

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE


**Order Submitted by:**


*/s/ Steven H. Campbell*
Marquetta J. Bryan
*Admitted Pro Hac Vice*
marquetta.bryan@nelsonmullins.com
Steven H. Campbell
*Admitted Pro Hac Vice*
steven.campbell@nelsonmullins.com

Nelson Mullins Riley & Scarborough, LLP
201 17th Street, Suite 1700

Atlanta, Georgia 30363
(404) 322-6000 Telephone
(404) 322-6050 Facsimile

***Attorneys for Petitioner***
***Le-Mayne De-Niro Gayle-Sawyers***

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on February 23, 2023, this document filed through the CM/ECF system will be sent electronically to all registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

                             */s/ Steven H. Campbell*
                             Marquetta J. Bryan
                             *Admitted Pro Hac Vice*
                             marquetta.bryan@nelsonmullins.com
                             Steven H. Campbell
                             *Admitted Pro Hac Vice*
                             steven.campbell@nelsonmullins.com